NORTHCUTT, Judge.
Michael Craun entered an open plea to one count of aggravated white collar crime, a first-degree felony, see § 775.0844(4), (5)(c), Fla. Stat. (2003), and was sentenced to thirty years’ imprisonment. He subsequently filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. He complained that there were numerous instances of ineffective assistance of counsel in connection with his plea and his sentencing hearing. We find merit in one of Craun’s arguments concerning his sentencing. We reverse the. postconviction court’s ruling on that point, and we remand for resentencing. We affirm the resolution of Craun’s other claims without discussion.
Craun and another man, Peterson, were charged in connection with an alleged conspiracy to defraud owners of time-share properties by .selling them worthless lists of supposed,, potential renters. In October 2004 both defendants pleaded guilty to one count of aggravated white collar crime. In November 2004 the State filed a sentencing memorandum that recounted postar-rest activities of both defendants. The prosecutor expected the two men to be sentenced together — the memorandum discussed them collectively, e.g., “both Defendants have had extensive discussions with a third party....” But the State had miscalculated Peterson’s guidelines sentence, and he had withdrawn his plea. Thus, only Craun was sentenced at a hearing held in March 20Ó5.
The witnesses at the hearing voiced favorable opinions of Craun. His father testified that Craun took care of his siblings when they were placed in foster care for a time after the children’s mother died. Craun’s former wife and the mother of his child testified that he went out of his way to help others who fell on hard times. He was a loving father, she said, and although he sometimes fell behind on his' child support, he always made arrangements to catch up. She related that their daughter had been the victim of a horrific crime and needed her father’s support. A local business owner recounted that one day when the computers in her restaurant failed, Craun voluntarily pitched in to help her. Over time he became what she characterized as a member of her family, helping out in two of her businesses without pay. Several of the witnesses thought Craun was a trusting man who placed too much faith in others. Craun himself related that he had been in the Marine Corps and served in a medical capacity in Desert Storm. He had received a commendation from the commanding officer at Camp Le-jeune for his role in quelling disturbances at the base. Craun had attended college and medical assistant school, and he wanted to pursue a four-year degree.
The State then argued its position based on its previously filed sentencing memorandum. It first contended that Peterson and Craun had conspired to mislead the court concerning their respective responsibility for the charged crimes. The prosecutor discussed telephone calls Craun made from the jail to a Ms. Kmiec in Kansas. In one of these monitored calls Craun said his attorney suggested that he shift the blame to Peterson in order to seek a' downward departure sentence. But Craun told Kmiec that he did not want to do that. He told her that if Peterson did not approve of the plan, he would not seek a departure sentence. Then the prosecutor discussed Peterson’s telephone calls to Kmiec. Peterson said that although he and Craun were partners, he made most of the decisions and he would take the blame. At one point the prosecutor attributed one of Peterson’s statements to Craun, but he then caught his mistake. The State contended that these telephone calls showed that Craun and Peterson were conspiring to mislead the court.
*1029 The prosecutor then posited that Peterson and Craun conspired to .deceive the court about their willingness to pay restitution. He laid out numerous facts about Peterson gleaned from telephone calls to Kmiec in which those two discussed keeping business revenues down until after restitution was imposed, filing bankruptcy, and retitling Peterson’s vehicle in his girlfriend’s name. The sentencing memorandum asserted that Peterson had transferred thousands of dollars to his girlfriend and to one of his companies. The memorandum also described a call in which Peterson told Kmiec to use some of his funds to pay his attorney’s fees and to reimburse his father. He said that he would pay back customers of one of the businesses but not another. In the only statement attributed to Craun, he told Kmiec that there were no assets with which to pay restitution and that he wasn’t worried — he would send “the bitches five dollars a month for the rest of my life.”
Finally, the State discussed another phone call between Craun and Kmiec in which Craun spoke of helping another inmate establish a Verizon telephone account for the inmate’s sister, who could not obtain one in her name. Craun asked Kmiec to help set up the account, and she did. He also asked her to set up a free AT & T account and explained how it could be done. Craun’s counsel informed the court that whatever may have transpired in setting up the telephone accounts, the accounts had been paid in full.
Although not specifically argued at the sentencing, the State’s memorandum contained an entire section devoted to the fact that Peterson was continuing to operate the time-share rental scheme from his jail cell. Peterson provided an affiliate in Kansas with a new script to use when approaching the time-share property owners. He offered to make Kmiec a partner in the business, and he stated that he was running the business from his jail cell. Also, a time-share owner had filed a new complaint concerning an attempted sale of the rental lists after Peterson had been jailed.
Craun’s criminal punishment code score-sheet prescribed a minimum sentence of 48.9 months’ imprisonment.[1] Although his plea agreement noted that the maximum penalty for the charged crime was thirty years’ imprisonment, it also stated that “a downward departure from 48.9 months will be considered, but is not assured.” But at the sentencing hearing, Craun’s counsel advised that he was not pursuing a downward departure sentence.
When announcing its sentencing decision, the court stated:
I don’t think he deserves any leniency. It’s clear that these people — these victims aré not going to get any money back. Whatever moneys they’ve paid, they’ve lost. It’s clear that he’s not going to stop his ways of crime. And how brazen is it of a person to continue their criminality in victimizing people from jail cells? We keep people incarcerated, hopefully, to protect them— hopefully to protect the community from them, but yet he commits the same crimes.
The court sentenced Craun to the maximum sentence for a first-degree felony, thirty years’ imprisonment.
In his rule 3.850 motion, Craun contended that his counsel’s performance at the *1030 sentencing hearing was deficient for various reasons. Although somewhat unart-fully pleaded, Craun asserted that counsel was ineffective for failing to object to the State’s sentencing memorandum and to its arguments at the hearing insofar as they concerned Peterson’s activities. The post-conviction court summarily denied these claims.
When the postconviction court rejected Craun’s motion, this court’s opinion in Johnson v. State, 120 So.3d 629 (Fla. 2d DCA 2013), had not been issued. Johnson holds that an ineffective assistance claim based on counsel’s failure to object to a sentencing court’s consideration of improper factors is cognizable in a motion for postconviction relief. Id. at 631 (relying on the analogous proposition that failing to object to improper reasons given in support of an upward departure sentence may support postconviction relief).
As was the case in Johnson, the transcript of Craun’s sentencing hearing clearly establishes that the court relied on improper considerations when it imposed the maximum allowable sentence. The court’s subsequent order denying Craun’s motion filed pursuant to Florida Rule of Criminal Procedure 3.800(b)(2) demonstrates this with even more clarity. When imposing sentence the court remarked that the “victims are not going to get any money back.” The order denying the rule 3.800(b)(2) motion stated that Craun “misrepresent[ed] his ability to pay restitution.”
But the damning telephone conversations detailed in the State’s sentencing memorandum and argued at the hearing were between Peterson and Kmiec, not Craun and Kmiec. Peterson, not Craun, hatched and implemented the scheme to avoid restitution. Peterson was actively trying to hide or transfer assets and to artificially minimize his business income. On the other hand, the State’s recitation concerning Craun’s telephone conversation reflected that he believed there were no assets with which to pay the restitution.
Likewise, it was Peterson, not Craun, who was committing what the court referred to as the “same crimes” while in jail. The court’s order denying Craun’s 3.800(b)(2) motion clarified what it meant by that term — it stated that the information it considered in imposing the sentence “related to a continuation of [Craun’s] criminal conduct charged in case 04-17727.” In case 04-17727 Craun was charged with fraud against the time-share owners. The section of the State’s sentencing memorandum discussing the ongoing time-share scam addressed only Peterson’s conduct described in his telephone calls from the jail. While the prosecutor discussed Craun’s role in obtaining allegedly fraudulent telephone accounts, he did not say that the State was prosecuting any crimes involving this conduct. And, apparently, those accounts had been satisfied. In contrast, the sentencing memorandum pointed out that a time-share owner came forward while Peterson was in jail and reported that she had been scammed by Kmiec, who, as the State noted in its memorandum, “has been in constant consultation with Defendant Peterson concerning the operation of the criminal enterprise.” Nothing presented either in the sentencing memorandum or at the hearing connected Craun to any alleged continuing fraud on time-share owners.
A sentencing court may not rely on “unsubstantiated allegations of misconduct or speculation that the defendant probably committed other crimes” when it imposes sentence. Nusspickel v. State, 966 So.2d 441, 445 (Fla. 2d DCA 2007); see also Doty v. State, 884 So.2d 547, 550 (Fla. 4th DCA 2004). In this case the court either incorrectly believed that Craun was the one actively concealing assets and continuing the time-share fraud, or it simply *1031 speculated that Craun was probably involved in the ongoing scheme of his code-fendant. Either way, its reliance on those considerations was improper, and it undermines our confidence in the outcome of the sentencing process. See Johnson, 120 So.3d at 632. Defense counsel should have objected when the court stated that Craun was not entitled to leniency based not on Craun’s own conduct, but on that of his codefendant, Peterson. Counsel’s failure to object was deficient performance, and because there was no possible tactical reason for such a failure, we need not remand this case for an evidentiary hearing. See id.
We therefore reverse the summary denial of this claim in Craun’s rule 3.850 motion, and we remand for a new sentencing hearing before a different judge. See Evans v. State, 979 So.2d 383, 386 (Fla. 5th DCA 2008) (reversing the summary denial of a rule 3.850 motion asserting ineffective assistance for failing to object to a vindictive sentence; remanding for resentencing by a new judge).
Affirmed in part, reversed in part, and remanded for resentencing.
VILLANTI and MORRIS, JJ., Concur.

. Our record does not contain the scoresheet itself, but no one disputes this number. We note that a first-degree felony charged under section 775.0844 is a level nine felony under the Criminal Punishment Code. It would re-suit in a minimum scoresheet sentence of 48 months’ imprisonment if it accounted for the only points scored. See §§ 921.0022, .0024, Fla. Stat. (2003).