NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT


JAY GOLDSTEIN,                          )
                                        )
            Appellant,                  )
                                        )
v.                                      )       Case No. 2D13-2598
                                        )
STATE OF FLORIDA,                       )
                                        )
            Appellee.                   )
_____)

Opinion filed January 7, 2015.

Appeal from the Circuit Court for
Hillsborough County; Chet A. Tharpe,
Judge.

Frank de la Grana, Tampa; and Kenneth S.
Siegle, Tampa, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Cerese Crawford Taylor,
Assistant Attorney General, Tampa, for
Appellee.



KHOUZAM, Judge.


            On January 20, 2012, Jay Goldstein was charged with one hundred

counts of possession of child pornography.  Though his Criminal Punishment Code

Scoresheet indicated a lowest permissible sentence of 1342.5 months (111.875 years)

in prison, the State offered Goldstein an open plea that would cap his sentence at ten years and that allowed for an unlimited amount of supervision. But the court rejected the plea negotiations. Goldstein entered an open plea, and the court sentenced him to fifteen years on count one and five years on the remaining counts, to run consecutively to the sentence on count one but concurrent to each other. These sentences are a significant downward departure.

Goldstein appeals, relying on this court's decision in Barnhill v. State, 140 So. 3d 1055 (Fla. 2d DCA 2014), to argue that the trial judge's explanation of the sentence revealed that he committed fundamental error by applying a general policy and lumping Goldstein with all other similarly charged defendants regardless of the evidence about his individual case presented at sentencing. Ultimately, Goldstein seeks resentencing before a different judge, which may or may not result in a shorter overall sentence for him. We conclude that Goldstein is entitled to the relief he requests. As we will discuss below, explanations at sentencing can lend legitimacy to the court's decisions and foster a public confidence in our judicial system. But the problem in this case, much like in Barnhill, is that the trial judge had established a general policy—personal to himself and at odds with the law of Florida—that caused him to sentence Goldstein, not for the crimes he had committed and for his circumstances at the time of sentencing, but rather for the crimes the judge feared Goldstein might commit in the future based on the nature of the crimes for which he was convicted.

I.    BACKGROUND

The State offered Goldstein a plea that would have capped his sentence at ten years. Goldstein had been collecting child pornography via the internet since 2007, but there was no evidence that he had used the internet to meet children or, most importantly, that he had ever had any sexual contact with any child. Indeed, Goldstein had taken a polygraph examination that indicated that he had never inappropriately touched a child. In offering the sentencing cap, the State had also considered the psychological evaluation prepared by Dr. Imhof, who had concluded as follows:

> Available information indicates Mr. Goldstein is a low risk to commit future sexual offenses, either a contact or pornography offense. Additionally, Mr. Goldstein presents without antisocial orientation, significant problems with general or sexual self-management, or substance use problems and is participating in mental health services and has a positive and supportive social system in the community, all of which suggest a reduced risk to commit sexual offenses in the future. It is further noted that Mr. Goldstein has been in the community for approximately eight months since his arrest and there is no indication he has engaged in any inappropriate sexual behavior or accessed child pornography via the internet. As research involving samples of generic sexual offenders has indicated risk for future sexual offenses is reduced by approximately half between five and ten years post release, Mr. Goldstein's already low risk will reach negligible levels at approximately eight years. Although diagnostic issues are unclear for Mr. Goldstein, mental health treatment is indicated given his excessive use of pornography, some of which involved minors, and the interference it has caused in his performance at home and work. Given Mr. Goldstein's relatively low risk for future sexual offenses and amenability for treatment, he presents with minimal risk should he be returned to the community with supervision and supportive mental health treatment.

Goldstein was receiving treatment as recommended in the psychological evaluation.

The court rejected the plea negotiations, and Goldstein entered an open guilty plea on April 23, 2013. After accepting the plea, the judge took testimony to consider before imposing sentence. Goldstein's attorney presented numerous letters, video recorded statements, and testimony from people who knew Goldstein in an effort to show that he was not a danger to the community. As a diving coach, Goldstein was constantly interacting with minors, and yet there was no evidence whatsoever that he ever acted inappropriately toward them. To the contrary, the evidence affirmatively suggested that no such contact had ever taken or would ever take place. Several of Goldstein's diving students, who had trained with him for years, stated that they had never felt uncomfortable around him. They trusted him, describing him not only as a friend but as a member of their families and a role model. One young woman stated that Goldstein was "an inspiration." Another attested, "Jay is one of my best friends. He still is."

Several parents asserted that even in light of Goldstein's conviction they would still want him to coach their children. They described him as a wonderful coach and friend. One mother wrote that the worst thing about this case was that her granddaughter would not be able to train with Goldstein as her daughter had. The father of two girls who were Goldstein's students testified that Goldstein was a leader, that he had the utmost respect for Goldstein, and that his girls and society would be missing out if Goldstein were put in prison. Another father of two children Goldstein had coached testified that his children had been taught to look out for inappropriate behavior by coaches, and they told him that Goldstein had never done anything inappropriate. The man stated, "frankly, knowing my kids are the single most important thing in my life,

given the opportunity I would have no apprehension to allow Jay to be their coach again."

Goldstein's neighbors, including two young men who had grown up living next door to him, testified that they were close to Goldstein and that nothing inappropriate had ever happened between them. One of the young men described Goldstein as "the brother I never had." The young men's mothers also testified they allowed their children to spend time with Goldstein and nothing inappropriate ever happened. One explained, "I believe in my heart that Jay would never, ever do anything inappropriate to a child." The other mother testified that she had five children who grew up living next door to Goldstein and that he had been a mentor to her boys when her husband left. She stated, "to this moment I would allow my children to be with him. He has been nothing but wonderful to my children. We are all human." She also noted that she is vigilant about child abuse because she owns a child care center.

Many of Goldstein's friends and colleagues, who had known him for years and even decades, testified as well. They maintained that Goldstein was not a threat. They noted the numerous opportunities that Goldstein had working with children and that there was never any indication that he had acted inappropriately in any way. For example, a fellow swim coach testified that as an educator, coach, and Boy Scout leader, he had been trained to look for child predation and he had never seen such behavior with Goldstein during the fifteen years that they had known each other. A friend who had been close to Goldstein for about thirty years described him as "the kind of person that I want to be."

Members of Goldstein's family also testified. Goldstein's former brother-in-law described Goldstein as "an outstanding individual" and a "pillar of the community." Several witnesses mentioned that Goldstein had been taking care of his ill mother for years and that recently he had been visiting her on a daily basis. Goldstein's cousin, a physician, stated that Goldstein would often contact him with questions about how to best care for his mother. "It's incredible, I can tell you," the cousin stated, "[b]etter than any nurse I've . . . worked with." All of the witnesses asked the court to show mercy on Goldstein.

Goldstein's attorney also made reference to two studies prepared for the United States Sentencing Commission that show how child pornographers who do not commit contact offenses are far less likely to commit any contact offenses in the future. He argued that the studies support a claim that online offenders have a lower recidivism rate, suggesting that Goldstein would be unlikely to reoffend.

On the other side, the State presented evidence that a search of Goldstein's computers uncovered 272 images of child pornography. Forty-eight "known notable child victims as characterized by the National Center for Missing and Exploited Children" were depicted. There were approximately eight videos located on Goldstein's computers. Various other images of child pornography were on discs categorized and labeled with titles such as PTHC, standing for "Preteen Hard Core." Some showed young children between the ages of eight and fifteen. All showed children engaging in almost any imaginable sex act. An investigating detective testified that Goldstein admitted downloading the child pornography and that he knew what it was.

In imposing sentence, the trial judge made the following statements:

I can tell you that I could probably count on one hand the number of persons that come in front of me charged with child pornography that have criminal histories. Almost every single one has never been involved in the criminal system. It's [a] first-time offense.

Someone mentioned that Mr. Goldstein lived in—or in his circle of friends, that no one knew about this. And I'm sure that you didn't because there's a dark side in child pornographers['] lives that no one knows about, except other child pornographers. Those are the ones that know.

And I would be just like you, had I not had the experience of being involved with child pornography, of knowing someone for 30 years or all my life because I'm related to them, or 10 or 15 years thinking I can't believe that this happened, that's not the person that I know, but what you don't also realize is that these—for the most part men, live two lives. They live the life that we all know. And then they live the dark side that no one knows other than other child pornographers that they are sharing their files with. . . .

Some people have told me that "it's just pictures, Judge." It's not just pictures. In order to make that picture or to make that movie, you have to rape a child. There's no other way of getting around it. You have to rape a child.

I'm in trial in this division every other week. . . . In the years that I've been trying these cases, there has not been one time when I didn't have at least two people, I have had as many as ten or twelve, approach the bench, some crying, saying that they had been abused as a child and could not hear this particular case. I have had more than that approach the bench and tell me that they have had a loved one sexually abused.

. . . .

I guess the last thing that I want to say is child pornography perpetuates the sexual abuse of children. It does. And although you may not have had someone tell you this before, but I know from my experience in sitting in this courtroom day-in and day-out, that these men in their dark side are sexually aroused, sexually interested in children. And a child's innocence, it's not like stealing a car or someone breaks in your house and steals your television or

- 7 -

your jewelry, you can replace that. You cannot replace a child's innocence. Once that's taken away from a child, it's taken away forever.

We—we are taught to respect adults. We're taught to respect our elders. An adult man can be rebuked by an adult woman. It's very, very, very hard for a child to stop an adult or a man from grooming them or getting into a situation where the child is vulnerable and now because of his sexual interest he takes advantage of that child.

We also know that we don't have years and years of studies and competent data to accurately predict whether or not a person who is a child pornographer is going to reoffend by actually touching a child because the phenomenon, according to experts, is still too new. And we have had studies that say the risk assessments are so low, and then that same study has gone back to those individuals who have then said we didn't tell the truth or we then went out and we actually did contact children when we told you that we had not.

There are other studies that say that the risk assessments are higher than what other studies say and they have come back and revised those studies as well.

The fact of the matter is, the phenomenon is so new to the scientific society, that we don't know what the honest to good true risk assessment is for a child pornographer going out and touching a child, even though we do know that they are sexually attracted to children. That's a given.

I'm not willing to take that risk. It's real easy for me to put a child—a car thief on probation, say don't do it again. He goes out and steals a car, okay. <u>I'm not—I'm not willing to take the risk that at some point in time Mr. Goldstein, or others that have a proclivity for child pornography, bondage, eight year olds, that's not at some point in time going to offend by actually sexually abusing a child.</u>

(Emphasis added.)

II.    ANALYSIS

The judge's statements in this case are remarkably similar—in fact, almost identical—to the statements that this court found fundamentally erroneous in Barnhill v. State, 140 So. 3d 1055 (Fla. 2d DCA 2014). In Barnhill, the same trial judge rejected the defendant's request for a downward departure sentence based on his general concern in child pornography cases. In sentencing Barnhill, the judge made the following statements:

> I just want you to know that I struggle on these cases, not just Mr. Barnhill's, but these types of cases every single day of my life since I've been put into this division, and there's not one day that goes by, not one, that I don't think about these cases.
>
> Mr. Barnhill is one of many individuals that come in front of me that have absolutely no criminal record whatsoever, none, that live a dark side, if you will, that no one knows about. Family members don't know about, teachers don't know about, business associates don't know about[.] [T]he only people that know about it is Mr. Barnhill and other persons that have like interests that he would choose to know about his interests as well.
>
> . . . .
>
> This child pornography phenomenon, if you will, is becoming an epidemic. It's bigger, I think, than what any of us in this room or in law enforcement circles absolutely realize . . . .
>
> And the psychologists in their book . . . list it as a fantasy [.] [P]edophiles are real. They're real. They may have some twisted fantasy about observing prepubescent children in bondage situations and being raped and having sexual intercourse and oral intercourse, being sodomized, but even though that might be a fantasy of watching those things on a computer while they stimulate themselves, it's real when they touch. And when they touch, that child is damaged forever, forever.

And maybe it's what some people don't even—don't even think about. It's just a picture. It's not just a picture. This is a child who has actually been manipulated either by fear or because a person is so much older and can control them and grooms them to go into these sexual scenarios, and even though you get some of these pictures where you get a six year old [sic] or seven year old [sic] and it appears to be, and I've seen them, I've seen them in this courtroom, where they appear in the video or on the pictures to be enjoying the act, they've been groomed.

That first time they are—they were raped and they are being raped each time as it happens. That's what scares me. That is what scares me in these types of cases.

But I guess first and foremost, I want you to know that there is not one thing that the [S]tate of Florida can, has or ever will be able to say that is going to cause me to sentence someone that I don't believe the sentence is appropriate, for whatever that is worth.

. . . .

. . . I honestly believe that this is an epidemic of greater proportions than any of us in this room . . . ever realized.

And there is no magic answer as to whether you're going to reoffend, or you're not going to reoffend in this particular case, whether you're going to touch or you're not going to touch. . . .

And some people say, well, you've taken my life away or you've taken my husband's life away or you've taken my father's life away, but in these types of cases, if you touch, you take the life away of a child[.] [A]nd I cannot tell you how many times I have seen in this courtroom where we have attempted to pick a jury[,] the numbers of men and women, adult men and women, some of which are older than I am [who] have stood at the bench in front of me with tears rolling down their faces because they were sexually abused as a child.

Id. at 1058-59 (some alteration in original).

In Barnhill, we held that the trial judge's statements indicated that he was applying a general policy in child pornography cases and that the application of such a general policy amounted to fundamental error:

> We recognize that these types of cases are disturbing by their very nature and that trial judges must deal with them on a regular basis. As a result, we are not unsympathetic to the difficulty that each trial judge must face when presiding over such cases. However, trial judges are required to rise above the disturbing nature of these and other crimes and to provide every defendant a fair opportunity to be heard by an impartial judge who will consider only the evidence presented to the court within that case.
>
> . . . It is . . . apparent that in considering Barnhill's sentence, the trial judge lumped Barnhill with all other similarly charged defendants irrespective of the testimony that Barnhill presented at sentencing.
>
> . . . [E]ven to the most casual observer, it could not be believed that Barnhill received a hearing in a dispassionate environment before a fair and impartial judge.  Rather, the transcript reflects the trial judge here was deeply concerned not by the facts specific to Barnhill's case but by the general nature of the crimes involved and the potential for defendants charged with these types of crimes to progress into crimes involving "hands-on" contact with children. Thus the trial judge at least implied that he would not consider a downward departure in child pornography cases as a general policy.
>
> We conclude that the application of such a general policy constitutes a due process violation resulting in fundamental error.

Id. at 1061 (emphasis added) (citations omitted).

By the same token, the statements made by the judge in the instant case reveal that he lumped Goldstein with all other similarly charged defendants and applied a general policy, regardless of the evidence presented at sentencing.  As we read the trial court's comments, the policy he explains is one of denying probation to all

- 11 -

defendants convicted of possession of child pornography because science has not proven they will not become sexual predators in the future. It is true that the purpose of uniform sentencing laws is to create "general policies" for the sentencing of defendants, but here the judge applied a personalized general policy that was at odds with Florida law.

Additionally, in both Barnhill and the instant case, the judge apparently feared that the defendants would commit new criminal acts of abuse that they were never accused of committing and took this speculation into account when imposing sentence. As in Barnhill, this fear was not based on the evidence before the trial court as to this defendant. In a different context, this court has stated: "A sentencing court may not rely on 'unsubstantiated allegations of misconduct or speculation that the defendant probably committed other crimes' when it imposes sentence." Craun v. State, 124 So. 3d 1027, 1030 (Fla. 2d DCA 2013) (quoting Nusspickel v. State, 966 So. 2d 441, 445 (Fla. 2d DCA 2007)); see also Martinez v. State, 123 So. 3d 701, 704 (Fla. 1st DCA 2013) ("[A] sentence based on mere allegation or surmise violates the fundamental constitutional rights of the defendant."). It seems even more evident to us that a court cannot rely on crimes it fears the defendant might possibly commit in the future simply because he has admitted the charged offenses. While protection of the public is clearly a proper consideration, the judge's comments taken in the context of the evidence presented raise the concern that the court was applying generalized, personal concerns rather than considering the specific circumstances of this case.

However, we must emphasize that the holding in this case, much like the holding in Barnhill, is narrow. This opinion does not disturb trial judges' wide discretion

in sentencing criminal defendants.  See Bracero v. State, 10 So. 3d 664, 665 (Fla. 2d DCA 2009) ("A sentencing court has wide discretion regarding the factors it may consider when imposing a sentence."); Stano v. State, 473 So. 2d 1282, 1286 (Fla. 1985) ("A trial court's discretion extends to determining what is relevant evidence at sentencing.").  A court has the discretion to reject a negotiated plea, to reject the testimony presented at sentencing hearings, and to impose departure sentences as permitted by law.  The court's discretion also encompasses providing explanations at sentencing to support the reasonableness and legitimacy of its decision to both the public and to the reviewing court.  Although a trial court is often free to impose a sentence with no public explanation, a thoughtful explanation can foster a public confidence in our judicial system.  Explaining to the public that possession of pornography is not a victimless crime, for example, is a completely appropriate role for the trial judge and for this court.

Likewise, we do not intend to suggest that trial judges cannot learn from experience or consider prior cases when seeking to impose a proper sentence.  See In re Inquiry Concerning a Judge, J.Q.C. No. 77-16, 357 So. 2d 172, 178 (Fla. 1978) ("Every judicial officer is the sum of his past.  When he dons his robe and ascends to the bench, he is not divested of the effects of his previous training, education and real life experiences.  He takes his official office as a human being, not as a judicial robot."); Nateman v. Greenbaum, 582 So. 2d 643, 644 (Fla. 3d DCA 1991) (recognizing that judges are "expected to be influenced by real life experiences").  On the contrary, we recognize that all good judges attempt to improve their skills and sensitivities from their prior experience on the bench.  So the fact that the trial judge in this case may have

- 13 -

relied on his previous training, education, and experience in imposing sentence is not problematic in and of itself—indeed, judges can and should learn from experience in order to reach a just result.

The problem here is that the trial court expressly considered and relied upon its own generalized fears of greater future offenses for any person who possesses child pornography. Such fear is simply a factor that the court, as a matter of law, had no authority to use when exercising its wide discretion or drawing from personal experience. Accordingly, we conclude that the court fundamentally erred in relying on its generalized fears of greater future offenses for any similarly charged defendant and applying a general policy in sentencing Goldstein contrary to Florida law. We reverse Goldstein's sentences and remand for sentencing before a different judge.

Judgment affirmed; sentences reversed; and remanded with instructions.

WALLACE, J., and DAKAN, STEPHEN L., ASSOCIATE SENIOR JUDGE, Concur.